Statement of facts.

[Filed January 13, 1890.]

# IN RE NORTH PACIFIC PRESBYTERIAN BOARD OF MISSIONS, RESPONDENTS; *v.* AH WON AND AH TIE, APPELLANTS.

CUSTODY OF CHILDREN—ACT OF FEB. 25, 1889—APPEAL.—An appeal lies to the supreme court of the State from the final decision of a circuit court, rendered in proceedings under the Act of the legislative assembly entitled "An Act to confer certain powers upon certain benevolent or charitable corporations, incorporated under the laws of Oregon, in relation to the control and disposition of homeless, neglected or abused children," approved Feb. 25, 1889.

CHANCERY JURISDICTION—REVIEW ON APPEAL.—The powers conferred by said Act upon the courts or judges therein referred to are a branch of chancery jurisdiction; and the decisions rendered in administering its provisions are in the nature of decrees, and are reviewable in the supreme court in the same manner that decrees are reviewed in other cases of equitable cognizance.

The important matter to be considered in the disposition of minor children under the provisions of the Act above referred to is the best interests of the child sought to be disposed of.

In a proceeding to enforce the surrender of two Chinese infant girls, taken under said Act, whose parents were dead, and who were found at a Chinese house of ill-repute, the court, after hearing the matter, adjudged that they be surrendered to a benevolent corporation, organized for the purpose of receiving homeless, neglected or abused children, and thereafter a petition was filed by a guardian of the infants, a Chinaman, who had been appointed by the county court, and who claimed that the infants had a grandmother in China, able and willing to support them, and after hearing proofs and allegations concerning the matter, the court decided that the infants be surrendered to the captain of a vessel bound for Hong Kong, to be taken there, and from thence sent by alleged Chinese friends to their grandmother at Chow Bow, sixty miles distant, and the only evidence in the matter that the infants had a grandmother able or willing to support them, or that they would be sent to her, was Chinese testimony, and a strong suspicion existed of a design to sell the children for immoral purposes; *held*, that in view of the facts and circumstances, the testimony was insufficient to justify the adjudication, and that it was erroneous.

APPEAL from a decision of the circuit court for the county of Multnomah, rendered in proceedings had under the Act of the legislative assembly of this State, entitled "An Act to confer certain powers upon certain benevolent or charitable corporations incorporated under the laws of Oregon, in relation to the control and disposition of homeless, neglected or abused children," approved February 25, 1889.

It appears that the said proceedings were instituted on the twelfth day of June, 1889, by the filing of a petition, on behalf of the Woman's North Pacific Presbyterian Board of Missions, for the arrest and surrender to said board of two Chinese children, under and in accordance

with the provisions of said Act; that a warrant of arrest was issued, and the children taken and given to said board; that Yum Chung, claiming to be an uncle of said children, filed an answer to the said petition; that thereupon an amended petition was filed, in which the Boys' and Girls' Aid Society also became a petitioner.  It was set out in said amended petition that the petitioners were both benevolent and charitable corporations, duly incorporated under the laws of the State of Oregon; that the Boys' and Girls' Aid Society was incorporated for the purpose of receiving, caring for and educating homeless, neglected and abused children of the State; that Ah Won and Ah Tie, the said Chinese children, were sisters, aged eight and ten years respectively, and that their parents were dead; that said Yum Chung claimed to be their uncle, but petitioners, upon information and belief, denied his sustaining any such relationship; that the children lived with one Fung Que, their reputed stepmother, in the city of Portland; that their place of residence, and where they were kept, was a house of ill-fame, and said Fung Que and the alleged uncle were inmates of said house, and the former was a woman of notoriously bad character; that said children were being trained to lives of immorality and vice, and unless removed from said evil guardianship and influence would almost inevitably become prostitutes and criminals.  An answer, in the form of a petition, was filed to the said petition by Wong Chin Way, who claimed to be the guardian of the persons and estates of said children, in which said answer and petition said Wong Chin Way denied absolutely, and upon information and belief, all the material allegations contained in the first mentioned petition, and alleged that the relationship of the said Yum Chung, referred to in said petition, existed in fact, and that if the children were taken from their relatives and said guardian and given to said petitioners they would attempt to entice them from the religion of their father and mother and their relatives now living; that said guardian intended to send the stepmother and said chil-

dren to China as soon as the business affairs and the estate of Wong Sing, the late father of said children, could be settled up; that the place where they were then kept and confined was an unfit place to keep the said children; that said guardian was a man of wealth and standing in the community, and was the duly appointed guardian of the persons and estates of said children, and abundantly able to care for them, and would do so according to law, if their custody were awarded to him by the court.

A hearing was had upon the said petition, answer and cross-petition, and subsequent pleadings filed in the proceedings; and the said circuit court thereafter, and on the twenty-fifth day of June, 1889, rendered the following decision:  "Now, at this time, the court having heard the evidence and the arguments of counsel in the above entitled matter, it is considered, ordered and adjudged that said children, Ah Won and Ah Tie, be, and they are hereby, until the further order of this court, surrendered into the care and custody of the Boys' and Girls' Aid Society of Oregon, each party to pay its own witness fees and clerk's and sheriff's costs."  That thereafter, and on the first day of July, 1889, the said Wong Chin Way filed another petition to the said circuit court, stating therein, among other things, that the petitioner had funds sufficient to provide the children with tickets and all necessary expenses in order to send them to their grandmother, the mother of their father, Wong Sing, who lived in Chow Bow; that they would be well cared for if sent to their grandmother, and would be raised according to the customs of their father; that Wong Gin Ma was about to go home to his family in China, and was willing to take the care and custody of the children, and would safely deliver them to their grandmother; that Wong Gin Ma was a respectable Chinese merchant and a member of the firm of Tong Way Yuen, doing business at 144 Second street, Portland, Oregon; that petitioner was a member of the family of Chinese to which Wong Sing belonged in his life-time, and was willing to obligate himself to the court

that the children should safely arrive at their destination if they were allowed to be sent to their grandmother; which said petition concluded with a prayer according to the tenor of said statements. That after hearing said petition, and the affidavit of Wong Gin Ma, to the effect that he knew the father of the children and their said grandmother, that he intended to go to China about the fifth of July, 1889, and would take care and charge of the children on their voyage home, and would see them safely delivered to their grandmother, the said court denied the said application and ordered that said children remain in the care and custody of the Boys' and Girls' Aid Society until the further order of the court; that afterward, and on the tenth day of October, 1889, said Wong Chin Way filed another petition, or application, to the said court, which, among other things, stated that the ship Coloma would sail from Portland, Oregon, for Hong Kong, China, on or about October 15, 1889; that Capt. Cyrus Noyes, of said ship, would take said children with him on board of the same and see that they were properly cared for and landed at Hong Kong, if the said court would direct that said children be taken to China; that said children had friends and relatives in Hong Kong who would care for them and see that they were safely forwarded to their grandmother at Chow Bow, China, which was about sixty miles from Hong Kong; that said children were then in the custody and control of the Boys' and Girls' Aid Society of Oregon; that their surroundings and teachings were not such as desired by their relatives and friends, and were contrary to that of their parents. Wherefore he prayed that the children might be delivered into the charge and custody of Capt. Noyes, to be taken by him to Hong Kong, to be delivered to their friends and relatives there, and by them sent to their grandmother in Chow Bow.

An answer was filed to the last petition by the Boys' and Girls' Aid Society, denying all the statements and allegations therein contained, and in which it alleged that the scheme to get said children and send them to Hong

Kong was but a device to obtain possession of them and remove them from the custody and possession of said society, so that they might be kept as property and trained up for dissolute and immoral lives.

Testimony was taken and submitted by both parties in regard to said matter and thereafter, and on the fifteenth day of October, 1889, the said circuit court rendered the following decision: "Now, at this time, this matter comes to be heard upon the petition of Wong Chin Way, guardian of said children, for an order directing that they be turned over to Captain Cyrus Noyes, of the bark Coloma, to be taken from Portland, Oregon, to Hong Kong, China, and there to be delivered to their relatives, to be taken to their grandmother. the mother of their deceased father, Wong Sing, at Chow Bow, China.   The petitioner appearing by J. C. Moreland, W. Y. Masters and W. L. Boise, his attorneys, and the respondent, the Boys' and Girls' Aid Society of Oregon, by its attorney, T. N. Strong, and it appearing to the court, from the testimony submitted, that it is for the best interests of said children that the prayer of said petition be granted, upon the filing of a bond by the said petitioner, with good and sufficient sureties, in the sum of $500, to the State of Oregon, for whom it may concern; and said petitioner having filed a bond herein. which has been duly approved by this court, it is therefore ordered and adjudged that the prayer of said petitioner be granted, and that the said Boys' and Girls' Aid Society of Oregon turn over to the sheriff of this county, and that said sheriff do take from said respondents, said Ah Won and Ah Tie, and deliver them to said Captain Cyrus Noyes, upon the service on said respondents of a copy of this order."

This is the decision from which the appeal herein was taken.   The appellant's attorneys, after the service and filing of the notice of appeal, prepared an undertaking for a stay of the execution of said decision, and applied to the said circuit court to fix the amount of the undertaking necessary for such stay; but said court refused to do so,

upon the grounds that no appeal lay from the decision. Thereupon said attorneys applied to this court for a mandamus, to be directed to the honorable judge of said circuit court, commanding him to allow said appeal and grant a stay of execution of the decision.

An alternate writ of mandamus was accordingly issued, and the return thereto by the said judge has been filed; also a reply on the part of the appellant to such return. The said writ, however, performed no office except to prevent the shipment of the children on board the said bark Coloma, and they remain in the care and custody of the appellant.

*Thomas N. Strong,* for Appellant.

*J. C. Moreland,* for Respondent.

THAYER, C. J.—Two questions are presented for consideration on this appeal. First, whether the decision of circuit courts, in matters arising under the Act approved Feb. 25, 1889, which confers authority upon certain benevolent or charitable corporations incorporated under the laws of this State, to receive, control and dispose of minor children in certain cases, are reviewable on appeal to this court. Second, whether the decision rendered by the circuit court herein, under the facts and circumstances of the case, was a proper disposition of the two Chinese children in question.

The respondent's counsel contends that the jurisdiction conferred by said Act is purely statutory, and as it does not provide for an appeal from decisions rendered in administering its provisions, no appeal will lie therefrom. and he cites some authorities which would seem to sustain his view. The constitution of the State, however, provides that. The supreme court shall have jurisdiction only to revise the final decisions of the circuit courts." § 6, Art 7, Const. This provision we considered in *Mitchell* v *Powers,* 16 Or. 492, and in the same case in 17 Or. 492, as conferring jurisdiction upon said court to revise al final decisions of the circuit courts. The provision does

not so declare in terms, but it seems to me that such must necessarily be the interence to be drawn therefrom. Giving the supreme court jurisdiction only to revise the final decisions of the circuit courts clearly implies that it has jurisdiction to revise such decisions whenever they are final in those courts. The test, therefore, of the jurisdiction of the supreme court is whether the decision sought to be revised is the final decision of the circuit court. But the appellant's counsel denies that the jurisdiction conferred by said Act is only statutory, and claims that the custody and disposal of infants is an ancient branch of chancery jurisdiction. He maintains that the act is only declaratory of a right which courts of equity exercised long prior to its adoption; and cites Schoaler on Domestic Relations, §§ 245, 249; 141 Mass. 203; 55 Am. Rep 452; 3 Eq Juris. § 1307; 13 N. E. Rep. 435, and 3 Or. 472, in support of his position. Under that view, the right of appeal in such cases exists independently of the constitutional provision referred to, as the exercise of the power is only the enforcement of an equitable right: and the change in the mode of procedure in order to accomplish the purpose would not affect the right of appeal any more in that class of cases than it would if the change in the mode of procedure applied to all cases of equitable cognizance. That the subject matter of the Act for a number of centuries past, has been recognized as a part of the general jurisdiction of courts of chancery, there can be no doubt. Judge Storey says: "Notwithstanding the objections thus urged against the legitimacy of the origin of the jurisdiction, it is highly probable that it has a just and rightful foundation in the prerogative of the crown; flowing from its general power and duty as a *parens patriœ* to protect those who have no other lawful protector. It has been well said that it will scarcely be controverted that in every civilized State such a superintendence and protective power does somewhere exist. If it is not found to exist elsewhere, it seems to be a just inference, from the known prerogatives of the crown, as *parens patriœ*, in

analogous cases, to presume that it vests in the crown. I
is no slight confirmation of this inference that it has been
constantly referred to such an origin in all the judicial in-
vestigations of the matter as well as in the discussions of
very learned elementary writers.

"Assuming, then, that the general care and superintend-
ence of infants did originally vest in the crown when they
had no other guardian, the question, by whom and in
what manner the prerogative should be exercised, would
not seem open to much controversy. Partaking, as it does,
more of the nature of a judicial administration of rights
and duties in *foro conscientiæ* than of a strict executive
authority, it would naturally follow, *eo ratione,* that it should
be exercised in the court of chancery, as a branch of
the general jurisdiction originally confided to it. Accord-
ingly, the doctrine now commonly maintained is that the
general superintendence and protective jurisdiction of
the court of chancery over the persons and property of
infants is a delegation of the rights and duty of the crown;
that it belonged to the court and was exercised by it from
its first establishment; and that this general jurisdiction
was not even suspended by the statute of Henry VIII.
erecting the court of wards and liveries." Storey's Eq.
Juris. §§ 1333, 1334. The doctrine is fully and ably dis-
cussed in chapter 2 of a work by Hockheimer, entitled
"Custody of Infants," commencing at page 45 of the book,
and the conclusions fully sustain the view of the appel-
lant's counsel herein. I am of the opinion, therefore, that
an appeal to this court in such cases will lie, that decisions
of the character of the one in question are in the nature of
decrees and are reviewable in the same manner.

Under this view, the case is here to be tried anew upon
the transcript and evidence accompanying it, which will
involve the consideration of the second question, before
suggested.

The contention of the parties at this time is not whether
the two Chinese children shall be taken from Fung Que
and Yum Chung, their reputed stepmother and uncle, and

awarded to the care and custody of the Boys' and Girls' Aid Society; that question has already been determined by the decision of the circuit court, made June 25, 1889. Nor is it as to whether said children shall be taken from said society and delivered to Wong Chin Way, their appointed guardian, to be sent to their grandmother at Chow Bow, in China, as that question was also determined by the said court, adversely to the petition of said Wong Chin Way, by its decision made on the sixth day of July, 1889; but it is whether the children should have been taken from said society and delivered to Captain Cyrus Noyes, in accordance with the decision made by said court on the fifteenth day of October, 1889. The important matter to be considered in administering the provisions of the Act requiring the compulsory surrender of minor children, as therein provided, is as to the best interests of the child; and its determination should not be influenced by fanatical zeal on the one side or by morbid sentimentality on the other. The purpose of the Act is to secure to homeless, neglected or abused children nurture and support during their tender years, and such an education and training as will give them a fair start upon the journey of life. Its aim is to develop whatever good qualities they may possess and thereby restrain the bad ones, in order that they may ultimately become useful to society, instead of being a pest. The establishment of the Boys' and Girls' Aid Society was intended, I have no doubt, for a humane and practical object, designed to alleviate misery and suffering and to promote the welfare of the community. The circuit court must have viewed it in that light, else it would not have ordered the care and custody of these children surrendered to it. The society accepted the trust, and, so far as appears, was in the faithful discharge of it at the time the decision appealed from was rendered. The high standing and reputation in the community of those having charge of the institution insures confidence in its successful management, and, I think, we may properly assume that if these children are allowed to remain under its control and

influence, their mental, moral and physical condition will be greatly improved. The respondent, however, and his other Chinese coadjutors, seem to have been seized with a strong desire that the children should be sent to their grandmother in China; and the circuit court, actuated by a kind and generous sentiment of apparent right and justice, concluded that such a course would be the proper one to pursue whenever a favorable opportunity was presented. Whether the court was right or not in that conclusion, no one would question, if fully assured that the children had a grandmother at Chow Bow, or elsewhere, able and willing to provide for them, and that the Chinamen who have interested themselves in the affair were honestly endeavoring to send them to her.

The difficulty in such cases is to ascertain the truth. Chinamen such as we have among us can rarely be trusted in such matters, however bland and plausible they may appear. Those of the race who have come to this coast have generally exhibited a total disregard of virtue, candor and integrity, and have shown such a propensity to cunning, deception and perfidy, that if they were to engage in an effort to accomplish an apparently meritorious object a strong suspicion would arise that there was some covert, sinister scheme at the bottom of it. In this case their purpose may be to send these children to their grandmother for the sole benefit of the children; but we have no means of ascertaining whether or not such is their real motive, nor had the circuit court any assurance that if the children had been sent in the care of Captain Cyrus Noyes to Hong Kong they would ever have reached Chow Bow, or have found a grandmother or anyone else to care and provide for them. Captain Noyes did not know their grandmother, and could give no assurance that they would be taken beyond Hong Kong, consequently the principal part of the affair would have had to be trusted to the Chinaman if the children had gone with him.

The respondent urged in his petitions, filed in the said proceeding, the sending of the two children to their grand-

mother in China, in order that they might be raised in accordance with the customs of their father, and suggested that their surroundings and teachings at the Boys' and Girls' Aid Society were not such as were desired by their relatives and friends, and were contrary to that of their parents.   This was a kind of intimation that the society would attempt to proselyte the children if thay were allowed to remain in its custody.   In a former age, under similar circumstances, such an intimation might have been deemed worthy of consideration; but that was when the highest aim and ambition of Christian nations were to extend and enforce the dogmas of the church, and individuality was wholly subordinated.   A new regime has since been inaugurated, which has in view the advancement of the human race by the culture and improvement of its individual members.   Something more is now required of mankind than a blind adherence to bigotry.   Modern civilization has developed broader views, has awakened a humane sentiment of kindness and benevolence, and imposed upon society more extensive duties.   Experience has proved that the body politic cannot be maintained and upheld, nor the progress of the world influenced. unless learning is propagated, morality inculcated, and a knowledge of the practical affairs of life extended to the constituent parts which make up the great whole.   Our societies of to-day, whether in the church or out of it, are seldom engaged in any narrow sectarian schemes, but are endeavoring to elevate and improve the moral and physical condition of the lower strata of humanity, in order to enable that class to secure more substantial happiness.   Men and women who engage in such a work,—who search in the dregs and scum of society, and find suffering and abused children, and relieve their wants and necessities, and train them in the path of rectitude, with a view to rendering them useful in the world, instead of being a burden and a nuisance, are fit and proper to be the guardians of any child, whether of Christian or pagan extraction.

It cannot be supposed for a moment that those who

opposed the sending of these children to China in care of Captain Noyes were actuated by any such desire as might be inferred from the language of the said petitions, or that they would have objected to the disposition which the circuit court attempted to make of them, if they had believed that the parties who were urging that course intended, in good faith, to place the children under the care and protection of their grandmother. And they have good grounds for believing that such was not the intent, but that the design was to devote them to an immoral and vicious use. They found the children in a Chinese brothel, where they were allowed to remain by their ardent and disinterested friends until the Woman's North Pacific Presbyterian Board of Missions took action to rescue them and put them in charge of one of the benevolent corporations provided for in said Act, and then it seems to have occurred to Wong Chin Way that "their surroundings and teachings were not in accordance with that of the father," and that it was eminently proper that they should be sent to their grandmother at Chow Bow.

As I view the proofs herein, the children were very properly disposed of by the first decisions made by the said circuit court, and, in my opinion, it would be very risky and uncertain to take them from the Boys' and Girls' Aid Society and put them in the custody of the respondent for any purpose, as the court could have no assurance that it would be for the interest of the children to do so.

In considering the legal aspect of this case, I have assumed that the decision appealed from was a final decision. I think I am warranted in that assumption by the decision of this court in *Pittman* v. *Pittman*, 3 Or. 472, which was cited by appellant's counsel. The principle of that decision I regard as decisive upon the point.

The decision appealed from will be reversed and a decree entered awarding the care and custody of the said Chinese children to the Boys' and Girls' Aid Society, appellant herein.

Strahan, J., expressed no opinion in this case.